May it please the Court, I'm Jennifer Middleton for Plaintiff Alan Lindgren, who is here in the courtroom today. I'd like to reserve five minutes for rebuttal. While agreements to arbitrate important federal statutory civil rights claims may be as enforceable as other contracts under state law, they are not more so. Why don't you speak right into the microphone. Sorry, Your Honor. I was saying that while agreements to arbitrate important civil rights claims may be as enforceable as other contracts, they are not more so. The district court erred in this case when it ruled as a matter of law that the parties were bound by an arbitration provision in a 1998 employee handbook to which neither side had objectively manifested its intent to be bound, based on a review of the entire record. The district court also erred in a second and completely independent ground for reversal here in finding that the provisions of that 1998 employee handbook arbitration agreement were not unconscionable under Oregon law. I've addressed these points fairly comprehensively in my briefs, and I'm happy to take any questions the Court may have. But absent that, I think I'd like to focus on the unconscionability issues under Oregon law. The formation and the content of the 1998 handbook arbitration provision are unconscionable under Oregon law. Oregon considers both oppression and surprise in determining procedural unconscionability, and certainly this was an oppressive contract of adhesion. Mr. Lingren is a $9 an hour employee of public storage. He had been working there for five years, and he was given basically just a jury waiver, single form, and asked to sign it. He was alone. There was no opportunity to ask questions, and there were no additional terms of this agreement presented to him. So not only was it a contract of adhesion in the employment contact text against a large multinational company like public storage, but there also was the element of surprise present here. The district court erred in finding that there was no surprise. Now, when you say it was presented with things, I can see three documents that he signed. One was the employee handbook acknowledgment. He said he had received a handbook, which was not correct. He hadn't received it. And the second is the last page of an agreement which says it's a waiver of all rights to a civil court action for a claim related to employment and which does not mention civil rights claims or the ADA or any of the statutes. That's correct. And then he signed an application for employment that it says, I understand that I will have to enter into an agreement with the company for arbitration. As I understand it, he didn't get the handbook until long afterwards? That's correct. He did not receive the handbook until long afterwards. And there was nothing in the handbook acknowledgment that alerted him that there were any additional arbitration terms buried in the back of that handbook. And in fact, I would also point out two things, which is that the handbook acknowledgment that he signed, you might notice, is page 53 of a 1999 version. The handbook that he was ultimately bound to is a 1998 handbook that contains only 35 pages. So it's unclear that the handbook acknowledgment that he signed even refers to the document to which the district court held him. Moreover, at the same time that he was provided the waiver of a civil jury form and the handbook acknowledgment, he was also given an acknowledgment of receipt of public storage policies. It's in the record, I believe it, excerpts of Record 24. And that document asked him to acknowledge that he received and agreed to be bound by a 2002 revised arbitration agreement. He was given that at the same time that he was given the handbook acknowledgment. So he signed that he had received some 2002 arbitration policy, which he understood to be that single sentence jury waiver. It all came in the same fax to him on one day, December 18, 2002. So to the extent that he even did acknowledge receipt of some handbook, we don't really know which one, he also acknowledged that he would be bound by a later version of public storages. Does the record show when he actually received the handbook? Pardon me? Does the record show when he actually received the handbook? Yes, he received it 14 months into his employment. And how many months is that after he signed the acknowledgment? Nine months. So nine months later. And in fact, he didn't even receive the acknowledgment until five months into his employment, and he had undergone extensive training by that time. This is all in the record. So when he looked at that handbook acknowledgment, it said, I understand that the handbook contains only those policies that I am most likely to need. And he read that and understood it to mean, well, I've gone through five months of employment, I've had extensive training, probably this doesn't have anything in it that I don't already know. Well, little did he think that there was a binding arbitration agreement that would apply to claims he might have against the company. Certainly that is not among the policies that an employee would expect as those that he would be most likely to need. So there's nothing in the record to indicate that he understood that there were any additional terms of any kind of arbitration provision other than that one-sentence jury waiver that he was given in the facts. We therefore have surprise. We also have, as I explained in my papers, failure of a manifestation of mutual intent to the 1998 terms of the arbitration provision. Did you call a Nelson case to the district court's attention in this matter? Nelson v. Cummings-Bagdad, Your Honor? Yes. Yes, we did. We did on reconsideration after she surprised us all. After she had already filed this order. Unfortunately, yes. It was the public storage only moved to enforce this later 2002 agreement. So that's what we addressed. And the employee handbook acknowledgment was not a major issue there because they were relying on this later agreement. And then the district court perused the handbook acknowledgment and determined to bind the parties to the 1998 agreement, whereupon we sought reconsideration saying, wait a minute, this is not even the agreement public storage sought to enforce. And by the way, the Ninth Circuit doesn't permit you to rely on a handbook acknowledgment to impose the terms of an arbitration agreement inside without something specific in the acknowledgment saying you're waiving statutory claims to a jury, rights to a jury, in that acknowledgment. So we did call it to the lower court's attention. Judge Aiken didn't mention it in her order. That's correct. So for all of those reasons, we have oppression and surprise here. Substantively, we also have unconscionability under Oregon law. First of all, the 1998 provision has a loser pays term that's very clearly set forth that the arbitrator shall determine the prevailing party and the non-prevailing party shall pay all of the costs of arbitration. We submitted evidence below that Mr. Lindgren was at the time working for $9 an hour after he was fired after he filed his claims and the Bureau of Labor found in his favor. The public storage terminated him actually only a couple months after he filed his claims and then the Bureau of Labor found in his favor. In any event, since that time, he has earned only a few thousand dollars doing odd jobs, collecting pallets, handing in work. He absolutely could not afford the cost of arbitration and what's more, they have an enormous deterrent effect. Merely seeing in that arbitration provision that he might be held not only to his own costs in the arbitration but to hundreds of dollars of hourly fees of arbitrators that public storage could force him to incur by going through this has a huge deterrent effect on his ability to vindicate his statutory rights. In addition to that, the 1998 provision has all kinds of procedural details that are weighted in public storage's favor. One of them is it has a truncated statute of limitations allowing claims to be brought within one year after the event or one year after the end of administrative proceedings. And this court has held on numerous occasions that a one-year statute of limitations which, like this one, bars equitable tolling and thereby cuts off the possibility of a continuing violations theory is substantively unconscionable. The agreement also has a requirement that the employee respond to any communication which could be emails, it could be phone calls, it could be letters. Within 30 days at pains of losing his claim, public storage does not have to do that either. It also only applies to claims an employee might bring. And these three items together combine to have the real-world effect of making this agreement substantively unconscionable because the scales are tipped so heavily. When you say it only applies to claims the employees might bring, do you mean that the employee can't litigate, file a suit in court but the employer can? That's right, Your Honor. The 1998 agreement applies by its terms only to claims of discrimination or harassment, which public storage admitted are not claims that it would bring against the employee, or claims arising out of the termination of an employee. And I submit that any claims public storage might actually have against an employee, such as violation of a duty of loyalty, would arise out of that particular conduct, not the fact that the employee was terminated. And indeed, public storage retains for itself the right to go to court to evict an employee from public storage housing as well in this agreement. So the effect of the scope of this agreement is that in effect it really only applies to claims the employee might bring. Thank you. Thank you, Your Honor. Thank you. Good morning. Elizabeth Semler from Sussman Shank for the Defendant Respondent Public Storage. I would only like to make a few points as this case has been briefed extensively. First of all, the defendants obviously believe that the district court should be affirmed. But one of the important issues that must be considered is what is the standard of review for the arguments made by the plaintiffs on reconsideration versus on the motion to dismiss? We believe that you can't simply take all the arguments made on the motion to dismiss and then all the new and different arguments made on the motion for reconsideration, put them all together and apply a de novo standard to them. Otherwise, there would be no reason to have different standards of review for a motion to dismiss or a motion to summary judgment and a motion for reconsideration. As this Court is well aware, the standard for a motion for reconsideration is much, much higher. It's an abuse of discretion standard. So the first point I'd like to make But if it's a legal question, an error of law is an abuse of discretion. Excuse me, Your Honor? I said if the issue is not a factual one but a legal one, the rule is that an error of law constitutes an abuse of discretion. Correct. And the point that the defendants are making is that on reconsideration, the plaintiffs made a number of new arguments. Well, that's not the court question. You said the standard is an abuse of discretion. For Rule 59e motion, I believe the standard of review is abuse of discretion. Yes. And an error of law is an abuse of discretion. So that if they're correct on the law, there's no difference in reviewing it on reconsideration because it's an abuse of discretion to make an error of law. But it would be different if they failed to raise the arguments initially at all. Well, they did raise the they brought the Nelson case to Judge Aiken's attention in the motion for reconsideration and the Nelson case had been around for 10 years, so it was the law and the judge ignored it. Well, the judge didn't ignore it from the standpoint that in the Nelson case, first of all you're applying California law and second of all Well, we're contract law too. There's arbitration law all over the thing. There's a big factual difference that I believe Judge Aiken did not ignore which is that in the Nelson case the acknowledgment was the only document that the employee signed and admittedly it did not refer to arbitration. In this case, however, the plaintiff signed multiple documents notifying him that he would have to arbitrate his claims. In fact What multiple documents? I read your opposing counsel three documents which I understand are He signed an application for employment before he began to work he signed a document that said I understand as a condition of working here I'm going to have to arbitrate. Which document are you referring to now? The handbook acknowledgment? July 22, 2002. The application appears at the exit of record page 108. And it says I understand that it requires that I enter into an agreement with the company for the arbitration. So he knew that someday he would have to enter into an agreement. He was aware that arbitration was going to be a condition of his employment and Judge Aiken found But it doesn't tell him what the terms are It doesn't tell him that he would have to waive his statutory rights or civil rights claims. I agree with you on that. Except that he also signed and Judge Aiken found he signed and he admitted he signed a paragraph in which he in bold face acknowledged that he was going to give up his right to a trial by jury. Again, not mentioning statutory rights or civil rights claims. There are cases of this district and I can provide the citation that say you don't need to tell an employee expressly what specific claims he's giving up or she is giving up in order for an arbitration agreement to be enforceable. Well, the ADA is this may be a pretty skinny ADA case on its facts, but under the Americans with Disabilities Act that's a remedial statute which was intended by Congress to give workers a right to certain benefits if they had these disabilities. Now, there's nothing in this stuff that he signed that would call anybody's attention to giving up rights created by these remedial statutes. How do you get around the Nelson case by saying that well, he signed this thing that says I waive any trial by a judge or jury? I think the way that you get around it is the way that Judge Aiken viewed the entirety of the documents that he signed which is to say he's not giving up his rights. He's giving up his rights to a jury but he's not giving his rights up to redress claims related to his termination. Well, that was the same issue with Nelson. He didn't give up his right to a right to the benefits. He just gave up supposedly they thought he gave up his right to a jury. And what we said there was you have to specifically have knowledge that you're giving up a statutory right. And I will, as I said, find the Oregon there is an Oregon District Court case I understand that is not binding that says that's not required for an arbitration agreement to be enforceable. And Judge Aiken Well, maybe that judge didn't read Nelson either. Perhaps. So part one is we don't believe that all of the arguments made in the different motions can be looked at the same. Second of all with respect to the unconscionability issue as has been discussed before this Court Let me ask you a question. What's the purpose of all these arbitrations? Why is it so important for the company to impose arbitration on its employees? Tell me why. Why do we need it? I can answer philosophically that the idea is arbitration provides a faster quicker, more efficient way of having claims resolved. Then why don't you say the same thing applies to the employer? If he has any claims against the employee, he'll have to arbitrate. Well, in fact this arbitration agreement the 1998 one does require the employer to arbitrate claims related to the employee's termination. But not other claims against the employee. But it only requires the plaintiff to arbitrate if you read the actual text of the provision claims arising from harassment or discrimination. There is nothing in that arbitration agreement that says claims arising during the course of employment unrelated to harassment or discrimination. It has to be arbitrated. If the employee is fired for any other reason, he can sue you? Termination requires arbitration by both employer and employee. Harassment and discrimination which would never be brought by an employer requires arbitration by the employee. That's all. All other claims. There's nothing else described as being forced to be resolved in arbitration under this 1998 agreement. What other claims would there be? Well, for example if when he was terminated, there were claims that he stole from the company. The employer would have to arbitrate that. But there could be ADA claims ongoing. For example, if he had a reasonable accommodation claim while employed. That would have to be arbitrated because it relates Excuse me. Let me get the agreement in front of me before I speak out of turn. So if he stole something that would be arbitrated? If it related to his termination. If it did not, it would not have to be arbitrated. Because the way this agreement is drafted, it states any claim by employee of unlawful harassment or discrimination allegedly occurring in the course of the employee's employment with the company which can't be resolved by internal processes will be submitted to arbitration. We will concede that there is no circumstance in which the employer would submit to arbitration that kind of claim. But all of the other provisions related to what has to be arbitrated relate solely to the termination of the employee and apply equally to both the employer and the employee. Are these provisions that you're talking about in the handbook? Yes. Which he didn't receive when he signed these forms. Well, the court found he agreed to be bound by a handbook and he submitted the 1998 handbook as the one that was operated. The question under Nelson is whether it was knowing waiver of these rights. And what you're saying is months later he got a handbook that told him what he had waived six months ago. The defendant submitted evidence that he was given a handbook when he was hired. The district court did not accept that evidence. Instead, held that he was bound by the 1998 agreement because that is the agreement he had and that's the agreement he submitted to the court for consideration. And when do you say he received that agreement? He says he received it 14 months after we were hired. We did submit evidence that suggested that could not be true. What did the court find? The court found that that was the one he was bound by and that he did not get it when he was hired, but he got it subsequently. So that brings us back to what I said. What you're saying is that these provisions that purportedly waive his rights were not given to him when he signed these forms and therefore the question is was it a knowing waiver of these right to litigate statutory claims when he didn't see it? Well, the district court found that in signing a document that said I agree to be bound by all these provisions. Well, the district court may have said that, but how is it a knowing waiver if you say I agree to be bound by provisions I've never seen? Well, I think it's a knowing waiver if you look at it in the context of the other documents that he signed. Again, a document that said very clearly Nothing that says you're waiving statutory rights. Nothing says you're waiving your ADA rights. He says I agree that all of my claims are going to be decided by an arbitrator and not a judge or a jury. And the district court found that that was sufficient so that, one, there was no surprise in terms of procedural incongruity. What is all my claims? What do you think that means to him? Well, I'm afraid I can't get inside his mind, but he's argued that it means to him he didn't know what he was giving up. Well, that's a pretty reasonable conclusion. Can I ask you a question, just as a practical matter? I'm just curious. How many claims have there been by employees that were initiated through arbitration? I'm afraid I can't answer that question. You don't know? I don't know. I'll suspect there were none. And that this whole program is just set up to prevent employees from complaining and bringing any claims and enforcing any rights they have. Certainly, if that's your perspective. You ought to be able to tell me how many claims employees have brought. Have actually brought successfully through arbitration. Or have instituted. You're asking how many claims have actually been instituted in arbitration by employees? Yeah. I don't know the answer to that question. I could certainly find out the answer, but I don't know the answer right here today. I'd like to know. I'm just curious. Imagine there are termination claims that are brought by employees, but I don't imagine there are too many civil rights claims that are brought through arbitration. But I do assume you have the normal termination problems. Right. But in this agreement, in fact, and I may be misunderstanding your comment, but in this agreement, it's only claims related to unlawful harassment or discrimination. Now, those might fall within civil rights claims, as you're describing them generally. But those are statutory claims. And I don't have the information on how many. You can't have arbitration if you're terminated for any other reason? Yes. Termination, all are made. That's what I said. There may be a number of termination claims that are brought to arbitration, but Judge Ferguson's question, I think, really refers more to this type of claim where you have a civil rights claim. Statistically, I don't have the information. Okay. Are there any other questions? A lot of this sounds like what was going on in Oregon and other places back in the old turn of the 20th century. The good old 20th century. The good old 20th century. We had child labor and you could throw people off the streets. And we said, oh, it's the sanctity of contract. Yeah. That's the way it is. Sanctity of contract. You're absolutely right about that, Your Honor. I'd like to just make a few points. What's the name of that case that came out of I think Oregon. But Brandeis decided something to do with child labor. Off the top of my head, I couldn't tell you that. As long before you were all born. I just have a few points. Maybe I was the child. They were working you too hard to recall. Just a few points. On the question of Nelson, the counsel mentioned that that was decided under California law. While it did come out of California, it was decided under federal law on the question of what is an appropriate claim for arbitration under the ADA's provision stating that arbitration may be permitted for ADA claims where it's appropriate and  I don't think it was a spotted cow case. Pardon me, Your Honor? It was a spotted cow case. It was an ADA case. Precisely. And in fact, on counsel's point that she said that an ADA claim, while the employee was still employed, for example, for reasonable accommodation, would not fall under this arbitration provision. But in fact, the ADA is clearly a statute prohibiting discrimination against people with disabilities and defines discrimination as failure to provide a reasonable accommodation. So, how an individual who's seeking a reasonable accommodation would not fall under the terms of this arbitration provision escapes me. Certainly, that kind of a claim would also need to be arbitrated under this provision, which again just goes to show that the one-sentence jury waiver that an employee signs here really gives them no notice whatsoever of what kinds of things they would be required to bring in arbitration or not required to bring. There's nothing in the record explaining to Mr. Lindgren, apart from this detailed arbitration provision and buried in the back of the handbook, that would tell him what claims he has to arbitrate. And in fact, to just look at the one sentence, it looks like any claim at all he would have to arbitrate, which of course is misleading. So, for instance, I agree with counsel that there are claims under the 98 provision that wouldn't have to be arbitrated, like a wage and hour claim would not fall under the 98 provision. But the employee sure wouldn't know that by reading this. They, you know, you read this, you think, okay, I have a wage and hour claim. What am I supposed to do? So, we have surprise here under Oregon law. We also have no knowing waiver under Nelson because there's just nothing that was brought to Mr. Lindgren's attention to alert him of what he was waiving by signing this jury jury waiver. And indeed, that's consistent with Oregon law because in Vasquez Lopez, where the court found that the loan officer misrepresented the terms of the arbitration provision, that that was sufficient to find surprise under Oregon law. Now, here there was a there was a statute was statute of limitations there was a limitation on the statute of limitations, wasn't there? That's correct. It was a one-year period in the statute of limitations. Now, have you read this very famous but forgotten case of Engle v. Circuit City Scores? That's right, Your Honor, which finds, based on federal principles of fundamental fairness, that a one-year limitations period, particularly one like this that bars a continuing violations doctrine, is unconscionable. So, thank you, Your Honors. For all of those reasons, the District Court should be reversed. I have several others that we can look for. I'd like to make two follow-up comments. The first one is to distinguish best from the look best in the sense that in that case there was a deliberate, intentional misrepresentation. There is no evidence of that here. The plaintiffs have made the assumption that by alleging that the plaintiff's not given all the documents that there was a misrepresentation but those cases are very different in terms of there was no intentional inspection or fraud in the case. The second thing I would point out is that with respect to the short perspective limitations, the one-year period in this Articulation of Remedies does not just run from the time the event takes place. It also runs... I mean, there was an intention to limit constitutional rights, to limit remedies under remedial federal statutes and all that. Correct, but nobody said to the plaintiff, as they did in Gaston Lopez, don't worry, you can go to court later. Nobody lied about what the agreement did or did not do. The second point that I would point to is that one-year short inspection limitations. First of all, in Oregon, rather than California, which was very able-guided, Oregon does not come down the same way California does on short inspection limitations. It looks at them in the prism of Moxinger and says, does it make it unfair? In this case, the short inspection limitation runs from the later follow-up, excuse me, from one year from the incident or from the conclusion of an administrative proceeding, which in effect gives the plaintiff more time than they would ordinarily get, for example, with a bully proceeding where you have to file some 90 days from the conclusion of the bullying decision. A plaintiff is given a year to continue arbitration from that conclusion. So it is distinguishable from the law, and I think we might respond to that as well. All right, thank you. Let's see. Now we come to Creighton v. Blockbuster. Thank you.
judges: Goodwin, Pregerson, Reinhardt